## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **Robert Long III,** | |
| *Plaintiff*, | Case Number: |
| v. | |
| | Ad Damnum:  **$18,000 +** |
| **Trans Union LLC,** | **Atty Fees & Costs** |
| **Equifax Information Services, LLC,** | |
| *and* **NewRez LLC,** | |
| | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Robert Long III**, ("**Mr. Long**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **Trans Union LLC** ("**Trans Union**"), **Equifax Information Services, LLC** ("**Equifax**"), and **NewRez LLC,** doing business as **Shellpoint Mortgage Servicing** ("**Shellpoint**") (collectively, "**the Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Mr. Long against the Defendants for violations of the ***Fair Credit Reporting Act***, 15 U.S.C. § 1681, *et seq.* ("**FCRA**") and against Shellpoint for violations of the ***Fair Debt Collection Practices Act***, 15 U.S.C. § 1692, *et seq.* ("**FDCPA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, the FDCPA, 15 U.S.C. § 1692k(d),  and 28 U.S.C. § 1331.

3.      Shellpoint is subject to the FDCPA, and all of the Defendants are subject to the FCRA and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

4.      Venue is proper in Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action occurred within this District.

## PARTIES

### Mr. Long

5.      **Mr. Long** is a natural person residing in the community of Lutz, Hillsborough County, Florida, and a *Consumer* as defined by the FCRA, 15 U.S.C. §1681a(c), and the FDCPA, 15 U.S.C. § 1692a(3).

### Trans Union

6.      **Trans Union** is a Delaware limited liability company, with a primary business address of **555 West Adams St., Chicago, IL 60661**.

7.      Trans Union is registered to conduct business in the State of Florida.  Its Registered Agent is **The Prentice-Hall Corporation System, Inc., 1201 Hays St., Tallahassee, FL 32301.**

### Equifax

8.      **Equifax** is a Georgia limited liability company with a primary business address of **1550 Peachtree Street NW, H-46, Atlanta, GA 30309**.

9.      Equifax is registered to conduct business in the State of Florida, where its Registered Agent is **Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.**

10.     Equifax and Trans Union are nationwide ***Consumer Credit Reporting Agencies*** ("**CRAs**") within the meaning of 15 U.S.C. § 1681a(f) in that, for monetary fees, dues, or on a cooperative nonprofit basis, they regularly engage in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which use means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including the mail and internet. As CRAs, Equifax and Trans Union are aware of their obligations under the FCRA.

### Shellpoint

11.     **Shellpoint** is a Delaware limited liability company with a primary address of **1100 Virginia Drive, Suite 125, Fort Washington, PA 19034**.

12.     Shellpoint's Florida registered agent is **Corporation Service Company, 1201 Hays St., Tallahassee, FL 32301.**

13.     Shellpoint is a *Debt Collector* within the meaning of the FDCPA, 15 U.S.C. §1692a(6), in that it uses an instrumentality of commerce, including postal mail, interstate and within the State of Florida, for its businesses, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

14.     Shellpoint is registered with the Florida Office of Financial Regulation as a *Consumer Collection Agency* ("**CCA**"), holding license number **CCA9903197**. **SEE PLAINTIFF'S EXHIBIT A.**

## FACTUAL ALLEGATIONS

### The Debt

15.     In July 2006, Mr. Long obtained a mortgage for $291,000 for his primary residence in Florida (the "**Debt**") from Countrywide Financial.

16.     The Debt arose from services which were for family, personal, or household purposes, specifically a loan for Mr. Long's primary residence, and meets the definition of *Debt* under the FDCPA, 15 U.S.C. § 1692a(5).

17.     In 2008, a sudden collapse in housing prices nationwide and the resulting economic recession left Mr. Long, who was active in the real estate industry, unable to pay the mortgage. Around this same time, Mr. Long's lender, Countrywide Financial, itself became insolvent. Its assets were later acquired by Bank of America.

18.     Mr. Long made no payment on the mortgage since 2008.

19.     As such, for purposes of reporting any information about the mortgage to any CRA, the running of the reporting period prescribed by the FCRA would have terminated in 2015, which is seven years from the date of original delinquency. *See* 15 U.S.C. § 1681c(a)(4).

### Debt Transferred to Shellpoint and Reported to CRAs

20.     Around April 2020, the Debt was placed for collection with Shellpoint.

21.     By this point in time, the Debt had been in default for over 11 years.

22.     Around May 31, 2020, Shellpoint reported to Trans Union that the Debt was "paid as agreed" in April 2020 – yet, somehow, it was more than 120 days past due the next month, May 2020. **SEE PLAINTIFF'S EXHIBIT B.**

23.     Shellpoint reported the ***Date of First Delinquency*** ("**DOFD**") as May 1, 2020, meaning that this was the date the debt *first* became delinquent.

24.     CRAs like Equifax and Trans Union use a data furnisher's reported DOFD to comply with and compute the running of the seven-year reporting period prescribed by 15 U.S.C. § 1681c(a)(4).

25.     Shellpoint reported substantially similar information to Equifax, although in its report to Equifax, Shellpoint reported the DOFD was one month earlier – April 1, 2020. **SEE PLAINTIFF'S EXHIBIT C.**

26.     Shellpoint reported the account as "paid as agreed" for April 2020, simultaneously reporting a DOFD of April 1, 2020 – but claimed that by May 2020, the account was "more than 180 days past due." *Id.*

27.     Because Shellpoint reported that the Debt was first delinquent in 2020, the automated systems employed by Equifax and Trans Union incorporated Shellpoint's tradeline into Mr. Long's credit file and included it in reports they furnished to creditors, and potential creditors, concerning him.

28.     Shellpoint's reports had obvious flaws – it is impossible for an account to be "paid as agreed" in one month and then 120 or 180 days past due in the very next month.

29.     Trans Union and Equifax are required by the FCRA to use reasonable procedures to ensure maximum possible accuracy of the reports they produce.

30.     The fact that data has not yet been disputed by the consumer to the CRA does not mean the inclusion of the data is inherently reasonable, especially when flaws in the data are numerous and obvious. *See. e.g.  Adrienne L. Padgett vs. Clarity Services, Inc*., Case No. 8:18-cv-1918-T-30CPT, (M.D. FL. 2018), citing *DeAndrade v. Trans Union LLC,* 523 F.3d 61, 67 (1st Cir. 2008) ("Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates…This language is not ambiguous; it creates an obligation on the part of the consumer reporting agency to ensure the preparation of accurate reports **independent from § 1681i's reinvestigation requirement**.") **Emphasis Added.**

31.     Despite the inconsistent data reported by Shellpoint, Equifax and Trans Union accepted Shellpoint's report without question and integrated it within reports that each CRA sold about Mr. Long.

32.     The inclusion of information with obvious inaccuracies is inherently unreasonable.

33.     Further, no tradeline concerning the Debt should have been reported in 2020 as the seven-year reporting period, as prescribed by the FCRA, terminated in 2015.

34.     Shellpoint reported the account as "paid as agreed" without any negative payment history to Experian Information Solutions, Inc. ("**Experian**"), another large nationwide CRA.

35.    In sum, Shellpoint's reports to the three major CRAs were:

    a.    Paid as agreed, never late, to Experian;

    b.    Paid as agreed in April 2020, first delinquent in May 2020, and 120 days past due in May 2020, to Trans Union; and,

    c.    Paid as agreed in April 2020, first delinquent in April 2020, and more than 180 days past due in May 2020, to Equifax.

36.    Each of Shellpoint's reports was internally inconsistent and clearly incorrect.

### First Dispute of Accuracy of Reporting to Experian

37.    In July 2020, Mr. Long disputed Shellpoint's tradeline to Experian, stating that the $525,951 debt being reported to his credit history by Shellpoint was far past the seven-year reporting period and should be removed due to obsolescence.

38.    While Shellpoint reported no negative payment history to Experian, the presence of a half-million-dollar debt with a current monthly payment of $3,859 still had a severely detrimental impact on Mr. Long's debt-to-income ratios.

39.    Experian sent Shellpoint an *Automated Consumer Dispute Verification Request* ("**ACDV**") through a system known as e-OSCAR, asking Shellpoint to make a reasonable investigation into the dispute.

40.    Shellpoint responded to the ACDV, stating that its tradeline was correct while updating the payment history to reflect "on time" payments in March 2020, May 2020, and June 2020. Shellpoint also updated the balance to reflect that $529,264 was now owed. **SEE PLAINTIFF'S EXHIBIT D.**

41.     If a furnisher of data to a CRA, like Shellpoint, confirms disputed information as accurate, "the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true." *Hinkle v. Midland Credit Management, Inc.* 827 F.3d 1295, 1303 (11th Cir. 2016).

42.     Shellpoint had no information to suggest that the data was true, and, in fact, was in possession of data establishing the opposite – no payment on the mortgage had occurred since 2008, the mortgage had been in default since 2008, and as such, the Debt was non-reportable due to the running of the seven-year reporting period in 2015.

43.     Further, Shellpoint failed to update its report to disclose that its report was disputed by the consumer.  Shellpoint had no reasonable basis to believe Mr. Long *did not* dispute the accuracy of the reporting.

44.     The failure to update a report to reflect its "disputed" status in and of itself violates the FCRA. *See Saunders v. Branch Banking and Trust Company of Virginia* 526 F.3d 142 (4th Cir. 2008).

### Dispute of Accuracy to Trans Union

45.     Shellpoint originally reported the Debt to Trans Union as "paid as agreed" in April 2020 and 120 days late in May 2020. **SEE PLAINTIFF'S EXHIBIT B.**

46.     Around September 30, 2020, Shellpoint updated its report to indicate that May 2020 was no longer 120 days late but rather "paid as agreed," with payment in June 2020 being 30 days late and payment in July and August 2020 being 120 days late. September 2020 was reported as "paid as agreed." **SEE PLAINTIFF'S EXHIBIT E.**

47.     In its September 2020 report, Shellpoint appears to have failed to report any DOFD at all, despite the fact that the Metro 2 reporting standards established by the **Consumer Data Industry Association** ("**CDIA**") require the reporting of a DOFD. Trans Union requires its data furnishers to certify compliance with Metro 2 standards.

48.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring. Trans Union's acceptance of data which is clearly not in compliance with Metro 2 undermines the integrity of these highly engineered standards.

49.     Credit scores produced by the Fair Isaac Corporation, commonly referred to as FICO scores, are utilized in roughly 90 percent of consumer lending decisions and are thus the leading credit scores used in the USA. FICO scores utilize data reported by CRAs and furnishers which calculates a consumer credit score on the assumption that data is furnished in compliance with Metro 2 standards.

50.     The failure to adhere to the Metro 2 reporting standards can adversely affect a consumer's FICO score, especially in situations like Mr. Long's, since FICO scores heavily weigh recent late payment history when calculating a credit score. An account with a "pay status" of "120+ days late" *first* reported delinquent in July 2020 is given far more weight by a FICO score than an account which has been in default for a decade, as more recent accounts are more indicative of a current inability to pay.

51.     The failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness

of an FCRA violation under 15 U.S.C. § 1681n(a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

52.　Logically, it is impossible for a loan which was 30 days late in June 2020 to be more than 120 days late in July 2020. This fact should be obvious to Trans Union, one of the largest CRAs in the world.

53.　Despite Shellpoint making logically absurd and impossible reports, and Shellpoint's data being out of compliance with Metro 2 standards, Trans Union again accepted Shellpoint's data without question and incorporated it into Mr. Long's file.

54.　In November 2020, Mr. Long disputed the Shellpoint tradeline to Trans Union, stating that the account was too old to be reported and should be removed, and that Shellpoint's characterization of the debt "first" becoming delinquent in June 2020 was categorically false.

55.　Rather than conducting an independent investigation of Mr. Long's dispute, Trans Union simply sent an ACDV to Shellpoint. No human employee of Trans Union reviewed or made any determination about the accuracy of Shellpoint's wildly false data.

56.　Shellpoint returned the ACDV and verified its reported information was accurate. Shellpoint did not update its report to reflect that it was disputed by Mr. Long.

57.　Shellpoint clearly made no reasonable investigation into Mr. Long's dispute, since any reasonable investigation would have determined that: (a) the real DOFD was in 2008, meaning the entire Debt was no longer reportable; (b) an account 30 days past due in June cannot be 120 days past due the next month; and, (c) the report was clearly not *complete* unless amended to include notice that the information was disputed by Mr. Long.

58.     Trans Union's rubber-stamping of Shellpoint's ACDV response was likewise unreasonable. Courts in this district have recognized for at least 35 years that it is inherently unreasonable to rely solely upon a data furnisher's verification of accuracy when a CRA investigates a consumer dispute. "Merely reporting whatever information the creditor furnished was not reasonable, especially where the defendant knew of the impending dispute between the [parties] … The [credit reporting] agency itself clearly bears at least some burden of evaluation." *Swoager v. Credit Bureau of Greater St. Petersburg*, 608 F. Supp. 972 (M.D.Fla.1985).

## **Dispute of Accuracy to Equifax**

59.     Mr. Long also disputed Shellpoint's tradeline to Equifax in November 2020, reiterating that the account was too old to be reported, that Shellpoint's characterization of the debt "first" becoming delinquent in April 2020 was false, and that the tradeline should be removed.

60.     Like Trans Union, Equifax's "investigation" consisted only of its computer systems transmitting an ACDV to Shellpoint**.** No human employee of Equifax made any review or evaluation of the data.

61.     Equifax's dispute results make clear it relied only upon Shellpoint's "investigation," informing Mr. Long that, "We request that the reporting company verify the accuracy of the information you disputed. We provide them with any relevant information and supporting documentation you provided us with the dispute to consider as part of the investigation; and we request that they send Equifax a response to your dispute and update their records and systems, as necessary." **SEE PLAINTIFF'S EXHIBIT F.**

62.    Noticeably absent from Equifax's explanation of dispute resolution procedures is any mention of Equifax's own review of the dispute and independent evaluation.

63.    Around December 16, 2020, Shellpoint confirmed its report as accurate. Equifax's "Results Of Our Reinvestigation" stated: "This creditor has verified to OUR company that the current status is being reported correctly. This creditor has verified to OUR company that the prior paying history is being reported correctly. This creditor/agency has verified to OUR company that the date of last activity is being reported correctly. Historical account information was updated on this account." *Id.*

64.    Despite Shellpoint's report being out of compliance with Metro 2 standards – standards to which Equifax requires its data furnishers to adhere – Equifax accepted Shellpoint's confirmation of "accuracy" as sufficient to close its investigation.

65.    Mr. Long's situation makes transparent the systemic flaws and failures in Equifax's automated dispute resolution process which relies solely on ACDV responses. Data furnishers – who pay revenue to Equifax monthly – are presumed to be correct, even if a proverbial mountain of evidence shows otherwise. The consumer, whom Equifax receives no revenue from, is presumed wrong.

66.    Equifax continued to include the erroneous Shellpoint data in reports which Equifax sold concerning Mr. Long.

67.    Shellpoint's reports to Equifax now indicate that the account was "paid as agreed" since at least January 2015, became 30 days late in June 2020, was 180 days late

in July and August 2020, and paid as agreed from September through November 2020. **SEE PLAINTIFF'S EXHIBIT G.**

### Credit Reporting and the FDCPA

68.     Reporting a debt to a CRA is a *per se* attempt to collect the debt within. Further, credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms from [the consumer] … [the] alleged refusal to correct mistaken information can only be seen as an attempt to tighten the screws on a nonpaying customer." *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993).

69.     Shellpoint made multiple reports to at least three different CRAs, including several reports after receipt of disputes via ACDVs.

70.     None of Shellpoint's reports disclosed that the Debt was disputed by Mr. Long.

71.     Shellpoint was obliged to disclose the fact that the Debt was disputed in all subsequent communications about the Debt after notice of dispute. Shellpoint had no right to unilaterally nullify Mr. Long's dispute. *See*, *e.g.*, *Semper v. JBC Legal Group*, 2005 WL 2172377 (W.D. Wash. Sept. 6, 2005); *Evans v. Portfolio Recovery Associates*, 889 F. 3d 337 (7th Cir 2018).

72.     Further, Shellpoint had no right to determine on its own whether Mr. Long's dispute had merit. The FDCPA requires a debt collector to communicate a debt is disputed, and 1692e(8) "does not require an individual's dispute be valid or even reasonable. Instead, the plaintiff must simply make clear that he or she disputes the debt." *DeKoven v. Plaza*

*Assocs.*, 599 F.3d 578, 582 (7th Cir. 2010) ("[A] consumer can dispute a debt for 'no reason at all ....'")

73.    Shellpoint should have reported the Debt with a Metro 2 ***Compliance Condition Code*** ("**CCC**") of "XB," which translates to "account information disputed by consumer."

74.    Most credit scores, including almost all versions of FICO, disregard a mortgage tradeline containing a compliance condition code of XB from a consumer's credit score computation. Had Shellpoint simply reported the proper CCC, it would have prevented Mr. Long's FICO credit scores from being adversely impacted, although any human reader of the report would still see the improperly included late payment history.

75.    Shellpoint's failure to disclose that the Debt was currently disputed materially damaged Mr. Long's credit scores.

76.    The failure to properly report a disputed debt *as disputed* creates a concrete injury-in-fact because the failure to disclose this information affects credit scores, meaning Ms. Long suffered "a real risk of financial harm caused by an inaccurate credit rating." *Evans v. Portfolio Recovery Associates*, 889 F. 3d 337, 345 (7th Cir 2018).

77.    Shellpoint's reports to the CRAs are *Communications* as defined by the FDCPA, 15 U.S.C. § 1692a(2).

### Failure to Provide Notice of 1692g Rights

78.    Shellpoint never mailed any written correspondence to Mr. Long with: (a) the amount of the debt; (b) the name of the creditor to whom the debt is owed; (c) a statement that unless the consumer, within thirty days after receipt of the notice, disputes

the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (d) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; or, (e) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

### **Shellpoint's Attempt to Modify Out-Of-Statute Debt into In-Statute Debt**

79.    On December 7, 2020, Shellpoint mailed Mr. Long a communication in connection with the collection of the Debt. Because Shellpoint received the Debt for collection when it was in default – and more than ten years past due – Shellpoint is a *Debt Collector* with respect to the Debt as defined by the FDCPA. **SEE PLAINTIFF'S EXHIBIT H.**

80.    The purpose of Shellpoint's communication was to get Mr. Long to sign a loan modification agreement, creating a *new* written contract governing the Debt.

81.    The statute of limitations in Florida for a legal or equitable action on a contract, obligation, or liability founded on a written instrument is **five years**. *See Fla. Stat.* § 95.11(2)(b).

82.    By creating a new written agreement, Shellpoint sought to take a half-million-dollar debt far outside the statute of limitations and convert it into a debt very much within the statute of limitations for legal enforcement.

83.    At no point did the communication from Shellpoint disclose that, due to the age of the Debt, Mr. Long could not be sued for it, and by signing the proposed "loan modification," he was subjecting himself to legal liability in excess of $500,000.

**Shellpoint's Tradeline Results in Denial of Credit**

84.    In December 2020, Mr. Long applied to Achieva Credit Union ("**Achieva**") for a loan of $164,000.

85.    Achieva obtained a copy of Mr. Long's Equifax credit report.

86.    Achieva stated to Mr. Long on December 4, 2020, that it could not approve him primarily due to "mortgage delinquency" and "escalating debt." **SEE PLAINTIFF'S EXHIBIT I.**

87.    The only mortgage delinquencies contained in Equifax's credit file on Mr. Long were the late payments reported by Shellpoint, and the only escalating debt was the $500,000+ mortgage recently appearing on his report.

88.    In December 2020, Mr. Long applied to Southeast Financial for a loan of $164,000.

89.    Southeast Financial obtained a copy of Mr. Long's Equifax credit report.

90.    Southeast Financial stated to Mr. Long on December 16, 2020, that it could not approve him primarily due to excessive recent delinquencies on his credit report. The only recent delinquencies were the late payments reported by Shellpoint.

91.    Equifax sold at least three other reports concerning Mr. Long with the false and defamatory Shellpoint data contained in it.

92.    In October 2020, Mr. Long requested additional credit from Barclays Bank of Delaware ("**Barclays**"). Trans Union furnished Barclays a report concerning Mr. Long which included the erroneous Shellpoint tradeline on or about October 29, 2020.

93.    The Shellpoint tradeline was the only adverse item appearing in the report Trans Union furnished.

94.    However, Barclays stated to Mr. Long it could not approve him because of derogatory credit history reporting.

95.    Trans Union also furnished reports to American Express, Capital One Bank, and at least four different reports to Synchrony Bank concerning Mr. Long with the erroneous Shellpoint tradeline.

96.    Mr. Long has suffered denials of credit, lost financial opportunities, and significant emotional distress and aggravation as a result of the Defendants' cavalier actions and failures.

97.    Mr. Long has hired the undersigned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## VIOLATIONS OF THE FCRA – *Equifax*

98.    Mr. Long incorporates paragraphs 1 – 97 as if fully stated herein.

99.    Equifax violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigation regarding the disputed Shellpoint tradeline, accepting logically flawed information as "accurate" in a response received from an automated ACDV and making no investigation of its own.

100.    Equifax violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy by including Shellpoint's false and inaccurate data in Mr. Long's credit report, which it provided to Southeast Financial and Achieva in December 2020, and to at least three other potential creditors as well.

101.    Equifax's conduct was willful and intentional, or, alternately, was performed with a reckless disregard for its duties under the FCRA, and its policies could easily, and reasonably, be foreseen to cause harm.

102.    As a result of its conduct, Equifax is liable to Mr. Long pursuant to the FCRA for statutory damages of up to $1,000 for each occurrence, and other relief.

**WHEREFORE,** Mr. Long respectfully requests this Honorable Court enter judgment against Equifax for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$6,000**, based only on the reports known to have been sold at this point in time) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Long's unspecified actual damages for loss of credit opportunities, inability to obtain needed loans at lower interest rates, higher interest rates on other accounts, and related economic and non-economic injuries, pursuant to 15 U.S.C. §1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE FCRA – *Trans Union*

103.    Mr. Long adopts and incorporates paragraphs 1 – 97 as if fully stated herein.

104.    Trans Union violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigation regarding the disputed Shellpoint tradeline accepting logically flawed information as "accurate" in a response received from an automated ACDV and making no investigation of its own, despite Shellpoint's tradeline lacking a required DOFD and containing obviously false data – *e.g.*, going from 30 to 120 days past due in the span of a single month.

105.    Trans Union violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy by including the false and inaccurate Shellpoint data in Mr. Long's credit report, which it provided to Barclays in October 2020, and to other creditors as well.

106.    Trans Union's conduct was willful and intentional, or, alternately, was performed with a reckless disregard for its duties under the FCRA, and its policies could reasonably be foreseen to cause harm.

107.    As a result of its conduct, Trans Union is liable to Mr. Long pursuant to the FCRA for statutory damages of up to $1,000 for each occurrence, and other relief.

**WHEREFORE,** Mr. Long respectfully requests this Honorable Court enter judgment against Trans Union for:

a.    The greater of statutory damages of **$1,000.00** per incident (for a total of **$8,000**, based only on the reports known to have been sold at this point in time),

pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Long's actual damages for loss of credit opportunities, inability to obtain loans at a lower interest rate, higher interest rates on other accounts, and related economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b.  Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.  Such other relief that this Court deems just and proper.

## COUNT III
## VIOLATIONS OF THE FCRA – *Shellpoint*

108.  Mr. Long adopts and incorporates paragraphs 1 – 97 as if fully stated herein.

109.  Shellpoint violated **15 U.S.C. § 1681s-2(b)** when it failed to update, modify, or correct its reports after receiving notices of dispute from Equifax, Experian and Trans Union, on three separate occasions.  Specifically, Shellpoint failed to conduct reasonable investigations when it erroneously concluded: (a) that an account in default for more than a decade and thus well past the running of the reporting period could still be reported; (b) that the DOFD was, alternately, April 2020, May 2020, or did not exist; (c) that an account could be 30 days past due in May and yet 180 days past due in June; (d) that alternate and contradictory reports made to the three CRAs were all, nonetheless, verifiable as accurate; and, (e) that this information was not disputed by Mr. Long and thus did not require disclosure of his dispute.

110.  Each dispute constitutes a separate request for investigation.

111.    The information that Shellpoint reported and verified was clearly inaccurate and this information was disseminated to multiple parties.

112.    Shellpoint's conduct was willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Long.

113.    As a result of its conduct, Shellpoint is liable to Mr. Long pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Mr. Long respectfully requests this Honorable Court enter judgment against Shellpoint for:

a.      The greater of statutory damages of $1,000.00 per incident (for a total of **$3,000**), pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Mr. Long's actual damages for loss of credit opportunities and related economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. §1681o(a)(1);

b.      Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.      Such other relief that this Court deems just and proper.

### COUNT IV
### VIOLATIONS OF THE FDCPA – *Shellpoint*

114.    Mr. Long adopts and incorporates paragraphs 1 – 97 as if fully stated herein.

115.    Shellpoint violated **15 U.S.C. § 1692e and 1692e(10)** when it made false representations and/or used deceptive means in an attempt to collect a debt by: (a) reporting

the Debt to three nationwide CRAs in 2020, despite the running of the reporting period; (b) claiming absurdly false information was accurate, *e.g.,* that the DOFD of the Debt was April 2020 (and May 2020), when it was in 2008; and, (c) attempting to coerce Mr. Long into signing a written agreement which would have created a new agreement for a long-dormant, out-of-statute, half-million-dollar debt, thus turning an unenforceable debt into an enforceable one.

116.    Shellpoint violated **15 U.S.C. § 1692e(2)(a)** when it made false representations about the character, amount, or legal status of a debt by: (a) reporting the Debt to three nationwide CRAs in 2020, despite the running of the reporting period; (b) claiming absurdly false information was accurate, *e.g.,* that the DOFD of the Debt was April 2020 (and May 2020), when it was in 2008; and, (c) reporting the Debt with a DOFD of 2020, thereby asserting that the Debt was within the statute of limitations, when in reality the Debt was more than seven years outside of the applicable statute of limitations.

117.    A debt collector's actions are subject to strict liability under 1692e(2)(a); *see Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004) ("[Section] 1692e(2)(A) creates a strict-liability rule. Debt collectors may not make false claims, period.").

118.    Shellpoint violated **15 U.S.C. § 1692e(8)** when it communicated credit information which was false, and should have been known to be false, to wit, the DOFD of the Debt was in 2020, and the Debt was still within the running of the FCRA's reporting period, when it was more than a half-decade past the reporting period.

119.    Shellpoint violated **15 U.S.C. § 1692f** when it used unfair means to collect a debt by: (a) reporting the Debt to three nationwide CRAs in 2020, despite the legal

running of the reporting period; (b) claiming absurdly false information was accurate, *e.g.*, that the DOFD of the Debt was April 2020 (and May 2020), when it was in 2008; and, (c) attempting to coerce Mr. Long to sign a written agreement which would have created a new agreement for a long-dormant, out-of-statute, half-million-dollar debt, thus turning an unenforceable debt into an enforceable one.

120.    Shellpoint violated **15 U.S.C. § 1692g(a)** when it failed to mail written notice to Mr. Long, within 5 days of initial communication with him, stating: (a) the amount of the debt; (b) the name of the creditor to whom the debt is owed; (c) that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (d) that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and, (e) that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

121.    Shellpoint's actions render it liable for the above-stated violations of the FDCPA, and Mr. Long is therefore entitled to statutory damages not to exceed $1,000.00 as well as other relief.

**WHEREFORE,** Mr. Long respectfully requests this Honorable Court to enter judgment against Shellpoint as follows:

a.      Statutory damages of **$1,000.00**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.      Actual damages, pursuant to 15 U.S.C. § 1692k(a)(1);

c.      Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.      Such other relief that this Court deems just and proper.

## JURY TRIAL DEMANDED

Mr. Long hereby demands a trial by jury on all issues so triable.

Respectfully submitted on **January 27, 2021**, by:

**SERAPH LEGAL, P. A.**

/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
FL Bar # 1015954
BMorgan@SeraphLegal.com
/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
FL Bar # 118103
TBonan@SeraphLegal.com
1614 N. 19th St.
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**ATTACHED EXHIBITS LIST**

A Shellpoint's Florida CCA License
B Plaintiff's Trans Union Consumer Disclosure, July 16, 2020, Excerpt
C Plaintiff's Equifax Consumer Disclosure, July 16, 2020, Excerpt
D Plaintiff's Experian Dispute Results, August 8, 2020, Excerpt
E Plaintiff's Trans Union Consumer Disclosure, November 24, 2020, Excerpt
F Plaintiff's Equifax Dispute Results, December 16, 2020, Excerpt
G Screenshot of Plaintiff's Equifax Report, Shellpoint Tradeline, December 18, 2020
H Shellpoint's Loan Modification Offer to Plaintiff, December 7, 2020
I Achieva's Email to Plaintiff Declining Loan, December 4, 2020